UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BETTY QUATROY, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 04-451
                                         c/w 04-1425

THE JEFFERSON PARISH                     SECTION: R(4)
SHERIFF'S OFFICE, ET AL.


## ORDER AND REASONS

Before the Court is Sheriff Newell Normand's Motion for
Judgment on the Pleadings, or in the alternative, Motion for
Summary Judgment.  For the following reasons, the Court DENIES
the motion.


## I.    Background

This action arises out of the death of 49-year old Vincent
Quatroy while incarcerated at the Jefferson Parish Correctional
Center (JPCC).  Before his imprisonment, Quatroy had been a
patient at the New Orleans Narcotic Center for about 15 years and
was taking a number of medications, including Methadone and

Xanax.  On February 4, 2003, Quatroy was remanded to the JPCC in good physical condition.  He completed his intake forms in the late afternoon, and on the forms he listed the medications he was taking.  Quatroy was on 10 different medications in total, including fluid pills for his liver, Xanax and Paxil for his anxiety, and Methadone for severe chronic pain.  Brigett Edmonds, who lived with Quatroy, brought his medications to the JPCC and spoke with the warden and medical staff about Quatroy's medical conditions.

Plaintiffs allege that the events leading to Quatroy's death occurred as follows. (R. Doc. 24).  Plaintiffs assert that Quatroy's medical problems began over 24 hours after he was remanded to JPCC, on February 5, 2003 at 10:45 p.m.  At that time, he complained of heart trouble and was given a liquid antacid by Nurse Gustavia Smith.  The next morning, at 7:40 a.m., Quatroy requested a doctor.  Instead, he was seen by medical assistant Tamyra Dyer during Med Pass at 10 a.m. and received medication about six hours later.  Quatroy began vomiting that night.  The next morning, on February 7, 2003, Quatroy was taken to Medical.  Dr. Gbadetole Williams examined Quatroy, who told the doctor of his Methadone use.  Quatroy was returned to his cell.  He saw medical assistants during Med Pass four times over the next 44 hours.

On February 9, 2003, at around 8:15 a.m., Quatroy suffered a seizure. Despite the seizure, Quatroy was not moved to medical observation, but was helped back to his cell by a medical assistant. Quatroy began vomiting blood about two hours later and was taken to Charity Hospital. He informed the staff there of his Methadone use. The staff declared him stable and released him back to prison with a prescription for Efinagan, a drug that controls nausea. Quatroy was put on a liquid diet for 48 hours since he could not keep food down. Back at the correctional center, he was placed in the suicide watch observation cell.

On February 10, 2003, at 7:45 a.m., Quatroy was found bleeding after he fell and hit his head. He had also defecated on himself. The officers gave Quatroy a shower, and shortly thereafter he began throwing up blood. Quatroy was taken to Medical three hours later and after spending a couple of hours there, was moved back to suicide watch. Quatroy was examined by Dr. Williams that night after he suffered another seizure, but Dr. Williams did not order additional treatment.

Quatroy's behavior and condition continued to deteriorate over the next few days. He refused to eat and had to be showered by the jail staff multiple times. He spent the entire day of February 14, 2003 sitting on the toilet. On February 16, 2003, at around 8 a.m., Quatroy had a seizure. He was taken to

Medical, where he had another seizure. Quatroy was given a bath, but was unable to get out of the tub by himself. After he was taken out of the tub at 9 a.m., he was placed in a holding tank, where he was laid on his right side and covered with a blanket. Quatroy was found dead at 10:57 a.m. on February 16, 2003, after less than 12 full days in the JPCC.

On February 17, 2004, Quatroy's parents, Rodney[1] and Betty Quatroy, and his then 28-year-old son, Vincent Angelo Quatroy, sued the Jefferson Parish Sheriff's Office, Sheriff Harry Lee, the JPCC, the Jefferson Parish Council, and various JPCC officers and employees. Plaintiffs alleged that the Sheriff acted with deliberate indifference to Quatroy's medical needs in violation of the 8th Amendment of the Constitution. Plaintiffs later substituted Newell Normand, the new Sheriff of the Parish of Jefferson, for former Sheriff Harry Lee in their Second Amended Complaint. *See* Fed. R. Civ. P. 25(d) (when a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party). Sheriff Newell Normand now moves for judgment on the pleadings under Rule 12(c), or in the alternative, for summary judgment. (R. Doc. 79).

---

[1]Rodney Quatroy died during the pendency of this matter and was terminated as a plaintiff on July 1, 2008.

## II.  Legal Standard

### A.    12(c) motion

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  A court presented with a motion to dismiss must accept all well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, --- F.3d ----, No. 07-30106, 2009 WL 941505, at *2 (5th Cir. Apr. 9, 2009).  To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A legally sufficient complaint does not need to contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id*. at 555.  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 2009 WL 941505, at *25.  If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S.

199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n.9 (5th Cir. 2007), the claim must be dismissed.

### B.  Summary judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to

evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).


## III. Discussion

The Court first notes that although defendant's motion is styled as a motion for judgment on the pleadings, or, in the alternative, as a motion for summary judgment, defendant's arguments go to the legal sufficiency of plaintiffs' pleadings — not to whether plaintiffs have evidence that establishes genuine issues of fact for trial. Accordingly, the Court will evaluate plaintiffs' claims under the motion to dismiss standard.

### A. Obligation to provide medical care to inmates

Defendant contends that plaintiffs have failed to state a claim against the Sheriff under Louisiana Revised Statute section 15:703 for the failure to provide medical care to inmates. The statute generally states that the governing authority of each parish is responsible for appointing prison physicians or contracting with health care providers for prison medical services. La. Rev. Stat. § 15:703. Plaintiffs do not oppose the

Sheriff's motion in this respect, and their complaint does not appear to direct any such claim against the Sheriff. The Court thus GRANTS defendant's motion.

## B. Individual capacity

Defendant also contends that plaintiffs have failed to state an 8th Amendment claim against Sheriff Normand in his individual capacity. Plaintiffs do not contest this assertion, and their complaint contains no facts to support such a claim. Further, Sheriff Normand was substituted as a party in the suit only after he succeeded Sheriff Harry Lee as Sheriff of Jefferson Parish. This suggests that plaintiffs' claims were intended against Normand only in his official capacity. To the extent any claims are directed against Normand in his individual capacity, the Court dismisses those claims.

## C. *Monell*

Defendant contends that Sheriff Normand is not liable in his official capacity under 42 U.S.C. § 1983 pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). A suit against a government officer "in his official capacity" is the same as a suit against the government entity of which he is an agent. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 468 (5th Cir. 1999) (citing *McMillian v. Monroe County, Ala.*, 520 U.S.

781, 784-85 1997)).  Thus to determine whether Sheriff Normand is liable in his official capacity, the Court looks to the jurisprudence discussing whether a municipality or local government entity is liable under section 1983. *Burge*, 187 F.3d at 470.

Under *Monell*, a local government entity may be sued if it is alleged "to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers.'" *St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690).  The local government can be held liable for a constitutional violation pursuant to a government "custom," but not under a theory of *respondeat superior* for injuries inflicted by employees. *Id.*  Municipalities can be held liable for injuries inflicted "by a government's lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Id.* at 121-122.  Thus municipal liability under section 1983 requires proof of three elements: (1) a policymaker, (2) an official policy or custom, and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *See Davis v. Tarrant County, Tex.*, --- F.3d ---, 2009 WL 931169, at *10 (5th Cir. 2009); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th

Cir. 2001) (citing *Monell*, 436 U.S. at 694). Proof of these

three elements is necessary "to distinguish individual violations

perpetrated by local government employees from those that can be

fairly identified as actions of the government itself." *See*

*Piotrowski*, 237 F.3d at 578.

### 1. Policymaker

In considering whether a local government can be held liable

for a policy or custom of a government official, the Court must

determine whether the government official is a policymaker for

the local government *in the area at issue*. *See McMillian v.*

*Monroe County*, 520 U.S. 781, 786 (1997) ("[o]ur cases on the

liability of local governments under § 1983 instruct us to ask

whether governmental officials are final policymakers for the

local government in a particular area, or on a particular

issue"). Such an analysis is dependent on state law. *See Burge*,

187 F.3d at 468 (citing *McMillian*, 520 U.S. at 786). Defendant

does not directly argue that the Sheriff was not a policymaker

under Louisiana law. But defendant does contend that the Sheriff

does not have the responsibility for providing medical care to

inmates incarcerated at JPCC, since Louisiana Revised Statute

section 15:703 requires the governing authority of each parish to

contract with a healthcare provider to provide healthcare to

10

prisoners in parish jails.  The Court construes this to be an argument that the Sheriff was not the official source of policies relating to the healthcare of inmates.  Accordingly, the Court will look to Louisiana law to ascertain the extent of the Sheriff's policy-making authority.

Plaintiffs' complaint alleges that the JPCC and the Sheriff had policies of not providing Methadone to inmates, irrespective of the inmate's medical history, and of observing, rather than treating, detoxifying inmates. (Second Amended Complaint at ¶¶51-52).  The Court must thus consider whether the Sheriff is the "final official source for policies, training and procedures" related to the distribution of Methadone and medical care of detoxifying inmates. *Burge*, 197 F.3d at 469.

Under Louisiana law, a sheriff is "virtually an autonomous local government official." *See Burge*, 187 F.3d at 469 (citing La. Const. art. 5 § 27).  The sheriff is the "chief law enforcement officer in the parish," La. Const. art. 5 § 27, and also "the keeper of the public jail of his parish." La. Rev. Stat. Ann. § 15:704.  As keeper of the jail, the Sheriff is charged with its administration, *see O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985), and has the power to "by all lawful means preserve the peace and apprehend all disturbers thereof." §

15:704.

It is true that the governing authority of the parish has some responsibility for the medical treatment of prisoners. The governing authority is responsible for either appointing a physician or contracting with a healthcare provider to provide medical services for prisoners confined in its jails. *See* La. Rev. Stat. Ann. § 15:703. The physician or healthcare provider must be licensed under the laws of the state. La. Rev. Stat. Ann. § 15:703(A)-(B). The parish authority is generally not liable for the action or inaction of a physician or healthcare provider. La. Rev. Stat. Ann. § 15:703(D). But the parish authority may be liable if it exercises "gross negligence or willful misconduct in the performance of its duties and obligations imposed by [§ 15:703]" and that gross negligence or willful misconduct is a "substantial factor" in causing a prisoner's injury. La. Rev. Stat. Ann. § 15:703(D).

The Court finds that, despite the parish's authority to choose the jail's healthcare provider, the Sheriff is the final policymaker when it comes to dealing with inmates suffering Methadone withdrawal *within the jail*. Courts have recognized that sheriffs are the final policymakers when it comes to the management of jails. *See O'Quinn,* 773 F.2d at 609 ("the

administration of the jails is the province of the sheriff"); *Oladipupo v. Austin*, 104 F. Supp. 2d 654, 661 (W.D. La. 2000) (sheriff is responsible for the administration of jail, including provision of medical care); *Jones v. St. Tammany Parish Jail*, 4 F. Supp. 2d 606, 613 (E.D. La. 1998) ("it is the Sheriff's office that has the obligation to provide medical care for the prisoners"). And conversely, courts have refused to hold parishes responsible for jail operations simply because of their responsibility for funding various aspects of the jails. *Jones*, 4 F. Supp. 2d at 613. As one Louisiana court explained:

> The general scheme which we gather from a reading of all of the statutes is that the City-Parish is responsible for the expenses of establishing, maintaining and operating the jail and for all of the expenses of feeding, clothing, and providing medical treatment to the prisoners while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed.

*Amiss v. Dumas*, 411 So.2d 1137, 1141 (La. Ct. App. 1982).

The Fifth Circuit has dismissed allegations against a parish police jury because the allegations did not go the police jury's responsibility for the physical maintenance and funding of the jail. *See O'Quinn*, 773 F.2d at 609. There, a prisoner who had received severe injuries after a beating by other inmates brought an Eighth Amendment claim against the police jury for failing to

provide adequate supervision and protection for the plaintiff. The court found that because the sheriff, not the parish police jury, was responsible for the care of prisoners within the jail, the complaint failed to allege a cause of action. *Id.* at 609.

Similarly, in *Jones,* the district court dismissed the plaintiff's allegations against the parish because the allegations related to the management, not the funding, of the jail. *Jones,* 4 F. Supp. 2d at 613. The court stated that:

> Sheriffs in Louisiana are final policy makers with respect to management of the jail. . . it is the Sheriff's office that has the obligation to provide medical care for the prisoners. The Sheriff's office also controls the inmates of the jail, the employees of the jail, and the daily operation of the jail . . . the Parish exercises no power or discretion in the functioning of the Sheriff's office or the jail. The Parish's responsibility to the jail is limited to the funding of the jail.

*Id*. And in *Griffin v. Foti*, 523 So.2d 935, 938 (La. Ct. App. 1988), the court found that the City of New Orleans was not liable when a prisoner slipped and fell in jail. The court reasoned that since the sheriff was responsible for maintaining the proper security in the prison, "[i]t would be unreasonable to require the local governing body to maintain its own personnel inside the prison walls subjects to its authority, where, by law, the sheriff is responsible for the prison."

The Court agrees with the analyses in these cases and finds
that the Sheriff, not the Parish Council, is the relevant
policymaker with regard to plaintiffs' claims.  Plaintiffs allege
that Quatroy's death was because of the Sheriff and JPCC's
policies of not providing Methadone to inmates and observing,
rather than treating, detoxifying inmates.  These allegations go
to the management of healthcare within the jail, not the ex ante
appointment of an adequate physician or healthcare provider.
Louisiana law makes the Sheriff the relevant policymaker in this
regard.

### 2. Official policy

A municipality may be held liable under section 1983 if the
constitutional violation was inflicted through an official policy
or custom. *See Piotrowski,* 237 F.3d at 579.  A municipality is
culpable for either an unconstitutional policy or a facially
innocuous policy promulgated "with deliberate indifference to the
known or obvious consequences" that constitutional violations
could result." *Piotrowski*, 237 F.3d at 579 (citing *Bd. of County
Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407 (1997)).
The official policy requirement can be met in a number of
different ways. *See Burge*, 187 F.3d at 471.  There may be an
actual policy contained in officially promulgated policy

statements, ordinance, or regulations. *See Piotrowski*, 237 F.3d
at 579; *Burge* 187 F.3d at 471.  Or there may be "a persistent
widespread practice of city officials or employees, which,
although not authorized by officially adopted and promulgated
policy, is so common and well settled as to constitute a custom
that fairly represents municipal policy." *Lawson v. Dallas
County*, 286 F.3d 257, 263 (5th Cir. 2002) (quoting *Webster v.
City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).
This may include a municipal custom of which the policymaker has
knowledge and to which he acquiesces. *See McNabola v. Chicago
Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993) (citing *Fletcher
v. O'Donnell*, 867 F.2d 791, 793-94 (3d. Cir. 1989)).  A plaintiff
must demonstrate that the municipal policymaker had actual or
constructive knowledge of the custom. *Pineda v. City of Houston*,
291 F.3d 325, 329 (5th Cir. 2002).  If there is no custom or
policy, the "official policy" requirement may be met when the
action of the policymaker itself violated a constitutional right.
*See Burge*, 187 F.3d at 471.  And finally, if a policymaker's
failure to take some action evidences a "deliberate indifference"
to constitutional rights, this inaction can fulfill the "official
policy" requirement. *See Burge*, 187 F.3d at 471 (quoting *City of
Canton v. Harris*, 489 U.S. 378, 390 (1989).  In this context,
deliberate indifference is a "stringent test," and "a showing of

simple or even heightened negligence will not suffice to prove municipal culpability." *Piotrowski*, 237 F.3d at 579 (quoting *Bryan County,* 520 U.S. at 407).

Defendant contends that plaintiffs' complaint alleges too generally that Quatroy's injuries were pursuant to a municipal custom or policy and that plaintiffs' complaint thus fails the pleading standards under *Twombly*, 550 U.S. 544. Specifically, defendant asserts that plaintiffs have alleged no facts to show deliberate indifference to the rights of prisoners. Defendant alleges that, to the extent plaintiffs' pleadings allege specific policies, those pleadings fail because they do not show a pattern of similar violations.

The Court finds that plaintiffs have pleaded "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs have pleaded that the decedent's injuries were pursuant either to the Sheriff's own policies or to specific JPCC customs of which the Sheriff had knowledge. Plaintiffs allege that "Sheriff Harry Lee developed and maintained policies, customs and practices exhibiting deliberate indifference to the constitutional rights of persons within the Jefferson Parish Correctional Center." (Second Amended Complaint at ¶48). More specifically, plaintiffs allege that

"[i]t was the policy, custom and practice of the JPCC, with the knowledge of Sheriff Harry Lee, not to provide inmates with Methadone . . . irrespective of an inmate's individual medical and drug history and background." (Second Amended Complaint at ¶51). Plaintiffs also allege that "[t]he policy, custom and practice of the JPCC, with the knowledge of Sheriff Harry Lee, is to *observe* inmates who are detoxifying, even off of a legally prescribed drug, but not to *treat* them." (Second Amended Complaint at ¶52).

These allegations sufficiently allege a custom that allegedly gave rise to Quatroy's injuries. A custom may be a "longstanding practice . . . which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas. Indep. School Dist.*, 491 U.S. 701, 737 (1989). A custom may include a practice of which the policymaker has knowledge and to which he acquiesces. *See McNabola*, 10 F.3d at 511. As one court explained:

> Unlike a "policy", which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it.

*Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass. 1995). Thus

plaintiffs' allegation that the Sheriff had knowledge of the alleged JPCC customs is sufficient to allege this element of municipal liability.

The allegations also meet the Fifth Circuit's requirement that a plaintiff allege either an unconstitutional official policy or a facially innocuous one "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579. Plaintiffs have not stated whether or not they contend that these customs are facially unconstitutional, but they allege that the Sheriff maintained the customs with deliberate indifference to the constitutional rights of prisoners. (Second Amended Complaint at ¶55). The complaint explains that because of the policy, the employees of the JPCC "were left with little or no direction as to how to care for an inmate experiencing deadly withdrawal." (Second Amended Complaint at ¶54). The Court finds the allegation that the Sheriff knew of the policy, and maintained it, despite the "obvious consequence" that a policy of nontreatment of withdrawal symptoms could result in deliberate indifference to a prisoner's serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976), sufficient to state this element of municipal liability.

Further, plaintiffs' complaint contains factual allegations about Quatroy's treatment that tend to make plaintiffs' "official custom" allegations plausible. For instance, plaintiffs allege that although both Quatroy and Bridgett Edmonds informed the JPCC about his Methadone prescription, Quatroy was never given Methadone. (Second Amended Complaint at ¶¶15-25). These allegations are consistent with plaintiffs' allegation that the JPCC had a policy of not providing Methadone to inmates. Plaintiffs' factual pleadings also provide grounds for his allegation that there was an "official custom" of not treating detoxifying inmates. Plaintiffs' state that with regard to Quatroy's treatment, the JPCC and its doctors, "did nothing," "took no other action," and "proscribed no additional treatment." (Second Amended Complaint at ¶¶30-34). Plaintiffs allege that instead of being treated, Quatroy was placed in an observation suicide cell. (Second Amended Complaint at ¶¶27-34). The Court finds that these allegations "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Plaintiffs' allegations meet the *Twombly* pleading standard.

Defendant's arguments that plaintiffs failed to plead facts that would show proof of deliberate indifference or facts showing a pattern of similar violations has no merit under *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507

U.S. 163 (1993). There, the Supreme Court held that suits involving municipal liability under section 1983 were not subject to the heightened pleading standard required by the Fifth Circuit at the time. *Id.* at 168. The Court rejected respondents' argument that a plaintiff must plead more than a single instance of misconduct to state a claim for municipal liability. *Leatherman*, 507 U.S. at 167. Rather, the Court held that such suits are governed by the liberal "notice pleading" requirement outlined in Federal Rule of Civil Procedure 8(a), which requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The complaint must also "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Mack v. City of Abilene*, 461 F.3d 547, 556 (5th Cir. 2006) (quoting *Leatherman*, 507 U.S. at 168). Thus while isolated constitutional violations ordinarily do not constitute municipal customs, *Piotrowski*, 237 F.3d at 581, plaintiffs need not set out a pattern of violations to survive a motion to dismiss. Boilerplate allegations of inadequate municipal policies or customs usually suffice. *Greenwood v. City of Yoakum*, 2008 WL 1858902, at *3 (S.D. Tex. 2008) (citing *Jacobs v. Port Neches Police Dept.*, 1996 WL 363023, at *13-*15 (E.D. Tex. 1996)).

The Court finds that plaintiffs' complaint gives defendant fair notice of the claims against it. Plaintiffs identified the allegedly improper customs and the resulting constitutional violations, and plaintiffs alleged that the Sheriff developed or tolerated the policies with deliberate indifference to the rights of the incarcerated. *See Atchinson v. District of Columbia*, 73 F.3d 418, 423 (D.C. Cir. 1996) (in municipal liability context, complaint need not allege facts supporting deliberate indifference allegation). Plaintiffs also allege the facts leading up to Quatroy's injuries in detail. Plaintiffs' allegations sufficiently satisfy this element of a *Monell* claim.

### 3. Violation of constitutional rights whose moving force is the constitutional violation

Under this prong of *Monell* liability, the plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights." *Hinjosa v. Butler*, 547 F.3d 285, 296 (5th Cir. 2008). Defendant does not contest that plaintiffs' complaint alleges a causal link between the alleged municipal policies and Quatroy's injuries. But defendant asserts that plaintiffs have not stated a claim for the underlying 8th Amendment violation. Deliberate indifference to the serious

medical needs of prisoners violates the 8th Amendment's
prohibition against cruel and unusual punishments. *Estelle v.
Gamble*, 429 U.S. 97, 103-04 (1976). Defendant contends that
plaintiffs have failed to allege: (1) a serious medical need and
(2) that Quatroy's injuries resulted from the Sheriff's
deliberate indifference.

    *i. Serious medical need*

   A serious medical need is "one that has been diagnosed by a
physician as mandating treatment or one that is so obvious that
even a lay person would easily recognize the necessity for a
doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir.
2008). Defendant asserts that plaintiffs have not identified a
serious medical need since Quatroy's "need" was Methadone.
Defendant's argument misses the point. Quatroy's medical need
was treatment for his withdrawal symptoms, which were obviously
serious. The complaint alleges that Quatroy suffered from
multiple seizures. (Second Amended Complaint at ¶¶23-38). It
alleges that he vomited blood multiple times and was unable to
eat. (Second Amended Complaint at ¶¶24-35). It alleges that he
defecated on himself and spent an entire day on the toilet.
(Second Amended Complaint at ¶¶28, 33). These symptoms alone are
sufficient, at this stage of the litigation, to allege a serious

medical need.  That Quatroy ultimately died from these symptoms is even more telling of their seriousness. *See Gonzales v. Cecil County, Maryland*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (when prisoner dies from withdrawal symptoms one can infer that withdrawal presents a serious medical need).

Further, numerous courts have held that the symptoms of withdrawal constitute a serious medical need. *See Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005) (prisoner suffering from methadone withdrawal, who defecated on himself and believed he was at a "wedding hotel," had serious medical need); *Sylvester v. City of Newark*, 120 Fed. Appx. 419, 423 (3d. Cir. 2005) ("There is no real dispute that Vargas was suffering from acute withdrawal with excessive vomiting, a serious medical need"); *Mayo v. County of Albany*, 2009 WL 935804, *4 (N.D.N.Y. 2009) (withdrawal from alcohol and drugs is a serious medical need); *Estate of Perry v. Boone County Sheriff*, 2006 WL 1587799, *3 (S.D. Ind. 2006) (alcohol withdrawal accompanied by seizures constitutes serious medical need); *Gonzales v. Cecil County, Maryland*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (heroin withdrawal presents serious medical need).  This Court agrees that acute symptoms of withdrawal easily present a serious medical need.  Plaintiffs have sufficiently pleaded this element.

*ii. Deliberate indifference*

Deliberate indifference in the context of a prisoner's underlying 8th Amendment medical claim is different from deliberate indifference in the context of municipal culpability. To establish the underlying claim, the plaintiff must establish that a municipal employee acted with subjective deliberate indifference to the prisoner's medical needs. *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).  To hold the municipality liable, the plaintiff must show that the employee's act resulted from a policy or custom the municipality maintained with objective deliberate indifference to the plaintiff's constitutional rights. *Id.*  The Court has already noted that plaintiffs sufficiently alleged that the Sheriff's office maintained the customs at issue with deliberate indifference to the constitutional rights of prisoners. *See supra.*  The Court must now consider whether plaintiffs have sufficiently alleged that an employee acted with subjective deliberate indifference to Quatroy's serious medical needs.

Deliberate indifference is defined as an official's knowing disregard of an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  To establish deliberate indifference, a plaintiff must show that officials "refused to

treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). An incorrect diagnosis does not establish deliberate indifference. *Id.* (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). Nor does the "failure to alleviate a significant risk that [the official] should have perceived, but did not." *Id.* (citing *Farmer*, 511 U.S. at 838). But when a prison employee knows that a prisoner is suffering from withdrawal, the failure to treat the symptoms or the delay in treating the symptoms until after seizures amounts to deliberate indifference. *See Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); *see also Fielder v. Bosshard*, 590 F.2d 105, 107-08 (5th Cir. 1979) (upholding a jury verdict finding that a sheriff and his jail officials acted with deliberate indifference by refusing to obtain medical treatment for a chronic alcoholic suffering from withdrawal).

Plaintiffs have sufficiently alleged that the JPCC employees acted with subjective deliberate indifference to Quatroy's serious medical needs. Plaintiffs allege that the JPCC warden and medical staff knew of Quatroy's Methadone prescription.

(Second Amended Complaint at ¶¶15-17). *Cf. Corley v. Prator*, 290
Fed. Appx. 749, 753 (5th Cir. 2008) (plaintiff did not raise a
fact issue as to subjective deliberate indifference when she
never told jail official that she was experiencing withdrawal and
never requested Methadone or other prescription medications).
Plaintiffs allege that despite this knowledge, the JPCC
employees, also named as individual defendants, "consistently and
repeatedly failed to treat Quatroy's medical needs, including but
not limited to a policy of nontreatment for seizures,
nontreatment for Quatroy's ability to eat, nontreatment for low
body temperature." (Second Amended Complaint at ¶43).  More
specifically, plaintiffs allege that the only medications Quatroy
received for his severe withdrawal symptoms were Efinagan, a drug
for nausea, and Zantac, for acid reflux. (Second Amended
Complaint at ¶26).  Plaintiffs allege that Quatroy suffered
multiple seizures but was not moved to medical observation.
(Second Amended Complaint at ¶29).  Plaintiffs allege that
despite Quatroy's seizures, bloody vomit, and refusal to eat for
days, prison officials repeatedly took "no action" to treat
Quatroy. (Second Amended Complaint at ¶¶28-33).  And plaintiffs
allege that on the last day of Quatroy's life, after he suffered
yet another seizure, prison officials merely gave him a bath and
laid him on his right side in a holding tank. (Second Amended

Complaint at ¶¶36-40).

In sum, plaintiffs have alleged that JPCC employees knew of Quatroy's use of Methadone, and thus that he would go through withdrawal without it, and still repeatedly failed to treat him. These allegations are sufficient to state a claim of subjective deliberate indifference.

### 4.    Summary

The Court thus finds that plaintiffs have stated an 8th Amendment claim against the Sheriff in his official capacity. Plaintiffs brought their claim against the Sheriff, a policymaker with final authority over jail operations, including medical care. Plaintiffs' complaint identifies two specific customs that they allege the Sheriff maintained with deliberate indifference to prisoners' constitutional rights. Plaintiffs allege that these customs caused the violation of the decedent's rights. And plaintiffs sufficiently allege the underlying constitutional violation — that JPCC employees exercised subjective deliberate indifference to Quatroy's serious medical needs. Plaintiffs' allegations survive the motion to dismiss.

## IV.  Conclusion

For the foregoing reasons, the Court DENIES defendant's Motion for Judgment on the Pleadings, or in the alternative, Motion for Summary Judgment.


New Orleans, Louisiana, this 14th day of May, 2009

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE